MAZE, JUDGE:
This appeal and cross-appeal arise from a judgment of the Fayette Circuit Court confirming a jury verdict in favor of Paul Nicholls, M.D., and dismissing the medical negligence claim brought by Ann Quattrocchi. Ann argues that the trial court improperly excluded evidence of a surgical incident which led to her sciatic nerve palsy. As the evidence of record shows exclusion of the evidence and the failure to grant a continuance amounted to an abuse of discretion, we reverse and remand.
Background
In October 2007, the Appellant, Ann Quattrocchi, had hip replacement surgery at Central Baptist Hospital in Lexington, Kentucky. The hospital is not a party to this action. Dr. Paul Nicholls was the operating surgeon. When Ann awoke from surgery, her leg was paralyzed. She experienced a condition that is known as sciatic nerve palsy, a rare complication of total hip replacement surgery. Her leg has remained paralyzed since and she experiences continuous pain and discomfort, resulting in many adverse effects in her daily life. Ann believes her nerve palsy was the result of a second procedure she did not consent to that was done to correct a perceived leg length discrepancy. It is alleged her leg was dropped in preparation for this second surgery, when the candy cane device used to stabilize her leg was improperly attached to the table and fell, pulling her leg with it.
In order to better understand the course of events in this case, we have set out a timeline of the significant events of this case, followed by a detailed discussion of those events. The record indicates:
*625 Date Event October 17, 2007 Surgery which resulted in sciatic nerve palsy. July 1, 2008 Ann asked Dr. Nicholls, her surgeon, who she still saw for treatment, if her leg was dropped during surgery. Ann alleges that Dr. Nicholls disregarded her question and failed to give a direct answer. March 24, 2010 Ann requested all of her medical records from Kentucky Orthopedic and Hand Surgery ("KOHS"). In a July 1, 2008, office note Dr. Nicholls stated that a leg drop did occur and may have been the cause of the injury. However, according to Ann's counsel, KOHS excluded that note from the documents provided to Ann. December 14, 2010 Ann filed suit. April 13, 2015 Dr. Nicholls is deposed, and testified that he did not remember whether the leg drop incident occurred or not. January 14, 2016 Final pre-trial conference in which Dr. Nicholls's counsel made a motion in limine to "prohibit testimony by plaintiff as to her leg being `dropped.'" The trial court sustained the motion with the "proviso that the ruling may be revisited at trial depending on the testimony of witness Hench." January 21, 2016 Inadvertent disclosure of the July 1, 2008, office note, which surfaced pursuant to a request for billing records by Ann's counsel. This was the first-time Ann or her counsel saw the doctor's note that affirmatively documented the leg drop.
*626 February 4, 2016 Trial court sustained defense counsel's motion in limine to exclude Physician Assistant Hench's testimony. The court stated it would be inclined to allow Ann's counsel to address the July 1, 2008, office note at trial with Dr. Nicholls. February 8, 2016 The trial court sustained a pre-trial motion the morning of trial to exclude evidence of Dr. Nicholls's July 1, 2008, note and Ann's expert's testimony. The trial in which all evidence of the leg drop was excluded, including Dr. Nicholls's own July 1, 2008, office note, began that afternoon. February 11, 2016 Jury verdict returned in favor of Dr. Nicholls. March 18, 2016 The trial court denied Ann's counsel's motion for a new trial.
After her surgery, but prior to her suit, Ann requested all of her records from the Central Baptist Hospital Custodian of Medical Records. When Ann received these records, there was no indication of the leg drop. Later, in February 2008, Ann's counsel requested Ann's records from Kentucky Orthopedic and Hand Surgery (hereinafter "KOHS"), where Dr. Nicholls practiced. None of these records revealed any indication of the candy cane incident in which Ann's leg was dropped.
Ann had worked as a nurse at the hospital for over thirty years. By July 2008, Ann had heard a rumor at the hospital from a physician assistant who had been in the operating room that her leg was dropped during surgery when the candy cane device became detached from the table. As a result, during an office visit with Dr. Nicholls on July 1, 2008, Ann asked him if her leg had been dropped during surgery. According to Ann, no direct answer was given to her and she later testified by avowal that Dr. Nicholls seemed to disregard her question as insignificant.
In March 2010, prior to filing her lawsuit in December, Ann again requested all of her medical records from KOHS. KOHS did not include Dr. Nicholls's office note from Ann's July 1, 2008, visit. In that note, Dr. Nicholls stated,
[w]e discussed this at some length. I told her that I thought about all that has happened. The only thing I can think of that may account for this would be that during the course of the procedure her leg did twist and fall while we were positioning her.
Ultimately, Dr. Nicholls's office note was only obtained by Ann's counsel in January 2016, three weeks before trial, when KOHS inadvertently produced the note in response to counsel's request for "patient accounts" pertaining to billing and insurance. The billing information was needed for trial purposes to reflect damage demands for Ann. This was the first time *627 Ann's counsel saw the written note that confirmed the rumor she had heard.
Prior to receiving this note, Ann and Ann's counsel made several efforts to substantiate the case for the leg drop incident. First, through a nurse paralegal, Ann's counsel contacted the Nurse Anesthetist who was in the room during Ann's surgery. When asked if Ann's leg was dropped during surgery, the Nurse Anesthetist responded that nothing unusual had happened during the surgery. Second, in Dr. Nicholls's sworn deposition, he was asked if he knew anything about Ann's leg being dropped in surgery. He responded that he didn't recall, and didn't know whether her leg was dropped or not.
Lastly, Ann's counsel filed their final witness list identifying members of the Central Baptist Hospital surgical team, including Elizabeth Hench. Dr. Nicholls's counsel questioned why Hench was listed as a witness. Ann's counsel responded that he wanted to ask her questions about the rumored leg drop. Hench was the physician assistant in the surgical room who is now believed to be the source of the rumor. Her deposition was eventually taken on January 27, 2016, six days after Ann's counsel inadvertently received Dr. Nicholl's July 2008 note. During Hench's deposition, she stated that,
I remember that we did her surgery. I remember prior to looking at the medical records that we did a hip. I remembered that her leg lengths were not identical and that we reopened and I do remember the leg falling, the leg holder falling with her leg in it....
Ann's counsel then continued asking Hench questions about the surgery. She further explained that, she didn't have a great memory of exactly what happened, but she did remember "that the leg did fall."
On February 4, 2016, Dr. Nicholls's counsel filed a motion in limine to strike Hench's testimony, arguing that the drop was not relevant (was not a deviation from standard of care and did not cause damage). The trial court sustained the motion to exclude Hench's testimony regarding the leg drop, concluding that her testimony was not definitive enough for the plaintiff's expert to render an opinion concerning standard of care and causation. However, the trial court emphasized the court was only ruling on the issue regarding Hench, and did indicate it would likely allow Ann's counsel to address the July 2008 office note with Dr. Nicholls, as it was his own office note.
On February 5, 2016, Dr. Hugate, Ann's expert, testified by video in Denver, Colorado. His testimony was essentially the same as his deposition testimony. However, this time he used the fact of the drop as an additional fact supporting his opinion that the injury to Ann's leg occurred after completion of the first stage of surgery.
On the morning of trial, however, prior to a jury being selected, Dr. Nicholls's counsel made two motions. First, counsel renewed their motion to strike Dr. Hugate's testimony regarding the leg drop incident. Second, counsel moved to preclude cross-examination of Dr. Nicholls with the July 2008 note. The trial court sustained the motions on the basis that it was too late to be introducing this evidence. Ann's counsel moved for a continuance. This was denied, though the court noted it would have granted it the previous Thursday when Hench's testimony was excluded. But now the court felt it was too late. The trial court ruled that all evidence pertaining to the leg drop incident should be excluded. The record reflects that the court was very conflicted with this decision and we fully understand the difficult position the trial court was in. Most notably, *628 the trial court mentioned several times their feelings regarding the decision to exclude by saying,
I deeply regret it because it's always been my desire to have cases decided on the merits and everybody have their full shot at it ... it's too late to get into that, it complicates our lives ... do the best you can do ... let's get away from the leg falling reports.... I understand it's his office note ... and you want to get that stuff in ... but it's just too late ... it would be more prejudicial than probative ... I'd like for everybody to have their full day in court ... but it's just too late ... it's the best I can do. I apologize to you. But that's just where we are."
The court went on to say, "I understand the dilemma I'm putting you in. I want to continue the trial to give everybody the chance to fully develop this issue, but it's just gone on too long." "It's just not fair to these guys [the defense] I don't think."
The trial, therefore, went forward without any mention of the leg dropping incident, including exclusion of Dr. Nicholls's office note. Additionally, in the previous week, Ann's counsel subpoenaed the custodian of medical records at KOHS to appear and produce Ann's complete and total file on the first day of trial. No one appeared at the first day of trial to produce the record. It was later learned that the record had been certified and sent to defense counsel in Louisville. On the third day of trial, the custodian finally appeared and her testimony was introduced by avowal. The record contained the July 1, 2008 office note. At this point, Ann's counsel moved for a mistrial on the basis that the custodian confirmed that Ann had previously requested all records and should have received the office note. The trial court denied the motion for a mistrial, but stated that the court,
was more than a little surprised to hear the testimony that they pull out certain things. I don't know what the standard is to pull out, but the patient asked for complete office notes ... I mean, it never occurred to me that they would go through there and cherry pick some of it.... You should've made a motion to continue last Thursday. I'd of granted it.... I appreciate Mr. Herren's concern and frustration. I really do. I was surprised when I heard the testimony this morning from the-whoever she is-the-reportedly the custodian brought in the records. I don't understand it. We are awful close to the end here. I'm going to have to overrule the motion for mistrial at this point. I think it is what it is and I'm gonna see what our good jury does, with the understanding that we can have this discussion-perhaps have this discussion at a later time.
The trial continued. The jury returned a unanimous verdict in favor of Dr. Nicholls. Ann's counsel made a motion for a new trial. The motion was denied on the basis that the trial court didn't feel Dr. Hugate's expert testimony was sufficient to have changed the outcome of the trial. This appeal follows.
Analysis
The issue here is centered around the trial court's exclusion of all evidence relating to the "leg drop" incident. Ann essentially argues that the trial court's ruling on Dr. Nicholls's pre-trial motions to exclude evidence of the leg drop, and the trial court's denial of the motion for continuance the morning of trial, were an abuse of discretion. It appears Ann is also arguing that the trial court's denial of a motion for a new trial was an error.
On appellate review, a trial court's evidentiary rulings and denial of a motion *629 for continuance are evaluated under an abuse of discretion standard. To amount to an abuse of discretion, the trial court's decision must be "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." Clark v. Commonwealth , 223 S.W.3d 90, 95 (Ky. 2007) (citing Commonwealth v. English , 993 S.W.2d 941, 945 (Ky. 1999) ). Absent a "flagrant miscarriage of justice[,]" the trial court will be affirmed. Gross v. Commonwealth , 648 S.W.2d 853, 858 (Ky. 1983). Where factual findings serve as a basis for the admission of evidence, those findings "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Mary Breckinridge Healthcare, Inc. v. Eldridge , 275 S.W.3d 739, 743 (Ky. App. 2008) (quoting CR[1] 52.01). Similarly, the trial court's "decision to admit the evidence on the basis of those facts" is evaluated under an abuse of discretion standard. Id. at 746. Finally, denial of a motion for a new trial is reviewed under a clearly erroneous standard and will only be reversed if the trial court's order was not supported by sufficient evidence. Miller v. Swift , 42 S.W.3d 599, 601 (Ky. 2001).
Recusal
It is unclear from Ann's brief if she is arguing that the trial court erred by denying her motion to recuse. Dr. Nicholls urges us to address this issue in case Ann is in fact making that argument. We will briefly say that "the burden of proof required for recusal of a trial judge is an onerous one. There must be a showing of facts of a character calculated seriously to impair the judge's impartiality and sway his judgment." Bissell v. Baumgardner , 236 S.W.3d 24, 28-29 (Ky. App. 2007) (quoting Stopher v. Commonwealth , 57 S.W.3d 787, 794 (Ky. 2001) ) (internal citations omitted). Here, the mere fact that Dr. Nicholls had operated on the trial judge's wife and that the trial judge had been a patient of KOHS is not sufficient to suggest that the trial court could not be impartial. Therefore, the trial court did not abuse its discretion by denying the recusal motion.
Pre-trial Motions and Continuance
Ann contends that the trial court abused its discretion when it sustained Dr. Nicholls's pre-trial motions to exclude any evidence of the leg drop, and when it denied her motion for a continuance. We agree.
At the final pre-trial conference on January 14, 2016, the trial court sustained a motion in limine by the Appellee to "prohibit testimony by plaintiff [Appellant] as to her leg being 'dropped.' " The trial court, however, sustained the motion with the "proviso that the ruling may be revisited at trial depending on the testimony of witness Hench." The court included this provision because Ann, at that time, had no proof that the leg had been dropped during the preparation for the surgery (the inadvertent disclosure did not occur until January 21, 2016). Therefore, the trial court held that Ann would not mention the leg drop, unless Hench's testimony revealed facts which supported the occurrence of the incident. Hench's testimony confirmed that Ann's leg was dropped, but did not offer conclusive facts about which direction or distance the leg fell.
On February 4, 2016, Dr. Nicholls's counsel made a motion to exclude Hench's testimony on the basis that her testimony was not relevant nor definitive enough. In sustaining the motion, the trial court expressed concerns about the definitiveness *630 of Hench's testimony, and whether Ann's expert would be able to render an opinion that complied with the Daubert v. Merrell Dow Pharmaceuticals, Inc. , 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed. 2d 469 (1993), standard. But after making the ruling, the court gave Ann time to discuss the option of asking for a continuance with counsel.
After discussing, Ann's counsel responded that Ann would not seek a continuance if Ann would be allowed to confront Dr. Nicholls with his July 1, 2008, office note. At first, the trial court stated it was only ruling on the Hench motion and then wanted to know if the court could rule on the July 1, 2008, note at a later time. Both Ann's counsel and Dr. Nicholls's counsel encouraged the trial court to make a decision regarding the July 1, 2008, note. The court then reluctantly found that the court would be inclined to allow Ann to address the note during Dr. Nicholls's testimony, since he had written the note.
However, the trial court did not follow through on this indication when the parties were next before the court. The following Monday, the first day of trial and prior to a jury being selected, defense counsel renewed the motion to exclude Dr. Hugate's testimony regarding the leg drop incident, and also moved to preclude confronting Dr. Nicholls with his own July 1, 2008, office note. The trial court sustained the motion regarding Dr. Hugate's testimony as to the leg drop only and found that it was "just too late in the ballgame" and would be unfair to the defense to allow the jury to hear Dr. Hugate's opinion regarding the leg drop. The trial court also sustained the motion to preclude Ann from confronting Dr. Nicholls with his own office note for the same reasoning. The court found that it was too late and though the court "deeply regrets it" due to the court's "desire to have cases decided on the merits," "it is simply too late." The court instructed that Ann should "get away from the leg dropping stuff."
Ann's counsel made a motion for a continuance. The court denied Ann's motion to continue. The court explained that the court was willing to grant the continuance on the Thursday before, and was surprised that no one had moved for it, but now it was too late. The court stated that it was prepared to grant the continuance on Thursday because of the "complications the new information caused," but felt it was too late and the parties had come too far to continue it at that point when the jury was about to come in for voir dire. The court instructed the parties to "just do the best you can" and acknowledged that the court fully understood the troubled spot Ann was in, but felt it was too late and unfair to Dr. Nicholls to allow introduction of the leg dropping incident.
The trial court has broad discretion when making evidentiary rulings. Goodyear Tire and Rubber Co. v. Thompson , 11 S.W.3d 575, 577 (Ky. 2000). It is well within a trial court's discretion to find that noncompliance with a scheduling order or delay resulting from noncompliance with Kentucky's Rules of Civil Procedure justifies the exclusion of evidence. Naive v. Jones , 353 S.W.2d 365, 367 (Ky. 1961). "The Civil Rules prescribe a practical pattern for the conduct of litigation and the effective administration of justice. To this end reasonable compliance is necessary ... [and] should be left largely to the supervision of the trial judge[.]" Id. Therefore, a trial court ruling that it is too late for evidence to come in due to the time for discovery having passed, or delay resulting from noncompliance with a scheduling order would not be an abuse of discretion and is clearly in the court's discretion to make such decisions.
Here, however, the trial court had repeatedly led Ann to believe that the evidence *631 regarding the leg drop was not untimely. As previously noted, the court found at the January 14, 2016, final pre-trial hearing that evidence of the leg drop may be able to come in if Hench's testimony corroborated the allegation. Then, again, on February 4, 2016, the court excluded Hench's testimony not based on timeliness, but rather on the fact that the court found it to not be determinative. But the court also stated it would be inclined to allow Dr. Nicholls's July 1, 2008, office note to come in, thus essentially finding that it wasn't too late on the Thursday before trial for the note to come in.
Similarly, the court did not find the Thursday before Monday's trial to be too late to grant a continuance and repeatedly stated that the court would have granted a continuance on Thursday but now on Monday it was too late. In fact, Ann's counsel specifically stated on Thursday that Ann would ask for a continuance that day, Thursday, if the July 1, 2008, office note was going to be excluded. The court stated that based on what the court knew at that point the office note would come in as it was Dr. Nicholls's own statement. Then, on Monday, when the court excluded Dr. Nicholls's July 1, 2008, note on the basis that it was "too late," the court asked Ann why she didn't ask for a continuance on Thursday. The answer to this question is that Ann relied upon the court's statement on Thursday that the court would be inclined to allow Dr. Nicholls's own statement to be used against him.
The trial court's rulings cumulatively amounted to an abuse of discretion due to the arbitrary and inconsistent nature of the findings. The trial court clearly erred by excluding Hench's testimony on the basis that it was not determinative enough, even though her testimony clearly established the fact that the leg drop did occur. The trial court then compounded this error by precluding Dr. Hugate from testifying about the leg drop.
And moreover, the trial court clearly erred by prohibiting Ann from cross-examining Dr. Nicholls with his own July 1, 2008, office note, which would be admissible as his own statement. In excluding the note, the trial court appears to briefly do a KRE[2] 403 analysis, suggesting that the defense would be unfairly prejudiced by the introduction of the testimony and a new theory of liability at such a late stage in the trial. While this could be a valid consideration, the trial court failed to recognize that the defense had knowledge of this drop, and the July 1, 2008, office note all along. Furthermore, the court's conclusion that the evidence was produced too late was contradicted by its statement less than a week earlier that the issue of the leg dropping incident could be re-evaluated depending on the testimony of Hench. The arbitrary and inconsistent nature of the trial court's findings resulted in an abuse of discretion.
Post-trial Motion for New Trial
Although we have found that the trial court abused its discretion by excluding the evidence and by denying Ann's motion for a continuance, we also conclude that the trial court abused its discretion by denying Ann's motion for a new trial.
Ann's counsel contends that counsel used reasonable diligence to investigate the leg drop incident and therefore should have been granted a new trial pursuant to CR 59.01(g). CR 59.01(g) states that a new trial may be granted if there is "[n]ewly discovered evidence, material for the party applying, which he could not, with reasonable diligence, have discovered and produced *632 at the trial." The trial court denied the motion for a new trial finding that,
the [c]ourt was prepared to grant plaintiff's motion as it is the [c]ourt's opinion that the plaintiff was entitled to have a copy of Dr. Nicholl's office note of July 1, 2008. However, the [c]ourt has reviewed Dr. Hugate's trial deposition and has reviewed the excerpts cited by counsel for both parties in the context of the contents of Dr. Nicholls's July 1, 2008, office note. It is the [c]ourt's opinion that Dr. Hugate's testimony on the leg drop did not satisfy the requirement that the admission of the testimony would have changed the likely outcome at trial, since the testimony did not establish that the leg drop was either the cause of an injury or was attributable to the negligence of the defendant.
Essentially, the trial court admitted that the evidence of the leg drop was relevant, but concluded that the note was too speculative because Dr. Nicholls simply stated that the leg drop "may have caused" the injury. Based on this conclusion, the trial court found that Dr. Hugate's testimony also failed to establish that the leg drop caused Ann's injury. Consequently, the trial court found that the exclusion of the evidence was, at most, harmless error because it would not have been sufficient to change the outcome of the trial. We must conclude that this factual finding was clearly erroneous, and thus that the trial court abused its discretion by denying Ann's motion for a new trial.
In his deposition testimony, Dr. Hugate focused on the lack of consent for the second procedure, and further concluded that the sciatic nerve injury occurred during the second procedure. In his later testimony concerning the leg drop incident, he stated that the leg drop which occurred during the preparation for the second procedure was one more factor which supported his prior conclusion. On direct examination when asked about the injury to Ann's leg, the Dr. Hugate stated that,
[just] as background, the odds of this occurring during a routine primary hip replacement are extraordinarily small.... In the papers that I looked up for the deposition, we're talking about the .02 to .04 percent range. So then when you look at a case like this, you question what is different about the case. The fact that she had a second procedure, the leg drop issue, that is in addition to a routine hip, so you're doubling, or more, in my opinion, the trauma to the tissues, to the nerve, the number of dislocations, and the drop with the stretch and twisting.... In my opinion, that's what's unusual about this case.
He was then asked, "is it your opinion that the injury to Ann's sciatic nerve, more likely than not, occurred during the second procedure?" to which Dr. Hugate responded, "[y]es. Or just prior to the second procedure when she had her leg in the fixture that fell."
On cross-examination, Dr. Hugate was asked, "[a]re you in a position to quantify the amount of trauma to the sciatic nerve in stage 1 versus stage 2?" He responded, "with precision, I can't. However, from the conclusion of the first operation a lot of stuff happened. So in my opinion, the preponderance of the trauma occurred or the majority of it occurred after the first operation." He was then asked, "[a]nd the preponderance of trauma would be the amount of dislocations and the retractions; correct? There's nothing else?" And he responded, "yes, and the potential fall and stretch and twist from that incident."
The admission of expert testimony is governed by KRE 702, which states:
If scientific, technical, or other specialized knowledge will assist the trier of *633 fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise ...
KRE 702 specifically codifies the standard adopted by the United States Supreme Court in Daubert and its progeny in evaluating the testimony of expert witnesses. In Miller v. Eldridge , the Kentucky Supreme Court explained that though " Daubert factors are helpful in evaluating the reliability of expert testimony, they are not an exclusive list." Miller , 146 S.W.3d 909, 918 (Ky. 2004). The Court explained that the United States Supreme Court has also made clear that the factors may not be relevant in each case and that the "gatekeeping inquiry must be 'tied to the facts' of a particular 'case.' " Id. at 918-19 (citing Kumho Tire Co., Ltd. v. Carmichael , 526 U.S. 137, 150-51, 119 S.Ct. 1167, 1175, 143 L.Ed.2d 238 (1999) ). Similarly, it is possible "that a claim made by a scientific witness has never been the subject of peer review, for the particular application at issue may never previously have interested any scientist." Id. at 919 (quoting Kumho Tire Co., Ltd. , 526 at 151, 526 U.S. 137, 150-51, 119 S.Ct. 1167, 1175 ). The Kentucky Supreme Court recognized that this type of "approach would forever prevent the introduction of techniques custom-made to test rare fact situations." Id.
Additionally, the Kentucky Supreme Court in Baylis v. Lourdes Hospital, Inc. , 805 S.W.2d 122, 124 (Ky. 1991), explained that though causation is an element of proof in negligence cases, it need not be stated in terms of certainty. The Court explained that "[w]hile evidence of causation must be in terms of probability rather than mere possibility, we have held that substance should prevail over form and that the total meaning, rather than a word-by-word construction, should be the focus of the inquiry." Id. (citing Walden v. Jones , 439 S.W.2d 571 (Ky. 1968) ; Morris v. Hoffman , 551 S.W.2d 8 (Ky. App. 1977) ). See also Combs v. Stortz , 276 S.W.3d 282, 296 (Ky. App. 2009). What is required is that there be sufficient proximate cause testimony for a jury to reasonably weigh the evidence on causation, not that the testimony be so definitive that there is no longer a question left to the jury. Id. at 125.
Here, Dr. Hugate testified that in his opinion there was a breach in the standard of care by doing the second procedure to correct an alleged leg length discrepancy, and it was also a breach to have the brace unsecured. He further stated that this second procedure, paired with the leg drop, resulted in Ann's leg "more likely than not" being paralyzed in the second procedure (or in preparation for the second procedure when her leg dropped). Both parties agree that paralysis of a sciatic nerve is not something that can necessarily be pinpointed to an exact moment in surgery. It is typically after a patient wakes up that anyone is aware of the paralysis. The mere fact that no one will be able to say exactly when this injury occurred during the surgery is not sufficient to exclude the evidence. There was sufficient expert testimony presented by Dr. Hugate for the jury to weigh both the effect of the second surgery, and whether the leg dropping incident was another factor that contributed to or caused her injury. The trial court's finding that the testimony was not determinative enough was clearly erroneous, and the exclusion of that evidence was an abuse of discretion. Therefore, the trial court's denial of a new trial, based on the court's findings, amounted to an abuse of discretion.
*634 Cross-Appeal 2016-CA-000503-MR
Dr. Nicholls's cross-appeal makes the argument that the trial court erred when it found at the January 14, 2016, final pre-trial hearing that Dr. Hugate's testimony was admissible as expert testimony. Consequently, Dr. Nicholls contends that, the trial court abused its discretion by admitting the testimony. Dr. Nicholls's cross-appeal alleges that Dr. Hugate's opinion that the second surgery, to which there was no consent, was the cause of Ann's injury, was "nothing more than rank speculation." In support of this, Dr. Nicholls cites to where Dr. Hugate was asked, "[b]ut if we're simply trying to decide, as an academic exercise, which is what we're doing here, whether-at what point it happened in the procedure, you said earlier, you can't state at what point it happened." Dr. Hugate responded that they were correct, he could not state at what point the injury happened. He went on to state that it was "the state in which her nerve experienced the most trauma is the state in which she would most likely have suffered the injury."
When asked what stage of surgery he believed the most trauma occurred, he answered that "[a]ll I can do is rely on my reason and experience, because, again, the operative note is so extraordinarily brief as to what may have occurred. And I think that at least we doubled the exposure. We doubled the reactor usage. And I think we at least doubled the number of times her hip was dislocated and reduced." He agreed that he was making an educated guess in the sense that "it's an extraordinarily rare complication to this degree" and "we'll never be able to quantify the trauma in the two procedures" due to the nature of the injury. As both parties admit, an injury to a sciatic nerve is not one that can necessarily be pinpointed to an exact moment in surgery. Instead, an evaluation of the event as a whole is necessary to determine when the injury most likely occurred, to which Dr. Hugate provided his opinion that it most likely occurred in the second procedure (or leading up to the second procedure when her leg fell) because the second procedure was what was unusual about the operation.
As we have discussed herein, there are certain injuries and facts to which strict application of the Daubert factors will not apply. Dr. Hugate's expert testimony was sufficient to present to allow the jury to reasonably weigh the evidence as to causation, and therefore the trial court's decision regarding the testimony was not clearly erroneous and did not result in an abuse of discretion by admitting it.
Conclusion
We affirm the cross-appeal for the reasons discussed herein. Additionally, we have analyzed the substance of Ann's brief and have reached the conclusion that it was an abuse of discretion to exclude evidence of the "leg drop" and an abuse of discretion in denying the motion for continuance and motion for a new trial. We therefore reverse and remand with instructions to allow Ann to introduce evidence of the leg drop and fully develop the issue.
We recognize the trial court was in a very difficult position in making these last-minute rulings. We also understand why the court wanted the case to come to a resolution, especially considering the length of time that had elapsed, including two notices to dismiss for lack of prosecution in 2012 and 2014. We also recognize that Ann's counsel could have, and likely should have, done more to obtain evidence regarding the leg drop sooner. However, we believe Ann's counsel acted reasonably in attempting to obtain evidence of the *635 "leg drop" and that Dr. Nicholls's counsel knew of the "leg drop" incident. We make clear, however, that there is no evidence indicating that defense counsel intentionally withheld the evidence from Ann. Furthermore, we acknowledge that it is the plaintiff's burden to seek discovery and, ultimately, to prove the essential elements of her case. However, it is our Court's responsibility to ensure that in such a situation as this, an individual receives a fair trial on the merits of their case.
ALL CONCUR.

Kentucky Rules of Civil Procedure.

Kentucky Rules of Evidence.