RENDERED: JANUARY 23, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2025-CA-0033-MR

EVERETT HAMPTON                                                    APPELLANT

APPEAL FROM FAYETTE CIRCUIT COURT
v.         HONORABLE KIMBERLY N. BUNNELL, JUDGE
ACTION NO. 21-CI-01137

SHARON ROBERTS, R.N. AND                                 APPELLEES
TRUSTAFF TRAVEL NURSES, LLC

AND

NO. 2025-CA-0035-MR

EVERETT HAMPTON                                                    APPELLANT

APPEAL FROM FAYETTE CIRCUIT COURT
v.         HONORABLE KIMBERLY N. BUNNELL, JUDGE
ACTION NO. 21-CI-01137

JASON ARIC ROBINSON, R.N.                                   APPELLEE

** ** ** ** **

BEFORE:  ECKERLE, MᴄNEILL, AND MOYNAHAN, JUDGES.

MOYNAHAN, JUDGE:  Appellant Everett Hampton ("Appellant" or "Mr. Hampton") developed a pressure wound while being treated at the University of Kentucky Hospital ("UK").  He alleged that negligence on the part of Appellees Sharon Roberts, R.N. ("Nurse Roberts") and Jason Robinson, R.N. ("Nurse Robinson") (collectively, "Appellees") caused this injury to develop and worsen. The Fayette Circuit Court granted summary judgment in favor of Appellees, but we find that genuine issues of material fact remain regarding causation and the other elements of medical negligence.  Accordingly, we REVERSE and REMAND the case for further proceedings.

## BACKGROUND

On April 16, 2020, Mr. Hampton fell at home and injured his back. This injury caused a series of health problems including muscle spasms, incontinence, and tingling in his legs.  He was taken to Pikeville Hospital on April 19, 2020.  Shortly thereafter he developed sepsis and paralysis of the lower extremities, among other maladies.  He was then transferred to UK on April 22,

2020, due to the severity of his ailments.[1]  On April 24, 2020, Mr. Hampton underwent neurosurgery to drain an abscess on his cervical spine.  By April 30, 2020, he was extubated and transitioned from the intensive care unit to the acute care unit for post-operative recovery.  The physician's orders for the acute care staff included a directive that he was to be repositioned every two hours.[2]  The underlying litigation concerns the following post-operative care.

On May 1, 2020, which was a Friday, Nurse Roberts was assigned to care for Mr. Hampton.  It is unclear from the record when precisely she noted a developing pressure wound[3] on his coccyx area.  Regardless, rather than input a wound consult order herself, she left this responsibility to the next shift nurse who then entered the order at 8:00 a.m. on May 2, 2020—Saturday morning.  Critically, UK does not provide wound consults overnight or on weekends.  Consequently, it was not until the following Monday, May 4, 2020, that Mr. Hampton received a wound consult by Nurse Robinson, who diagnosed him with moisture-associated skin damage.  Neither Appellee followed up with Mr. Hampton's care, nor notified a physician of his skin breakdown.  When Mr. Hampton was discharged from UK

---

[1] Although joined in the initial action, UK was later dismissed from this suit.

[2] Trial Record ("TR") 570.

[3] Otherwise known as a decubitus ulcer or bedsore.

on May 14, 2020, his injury had progressed to either a stage four or unstageable sacral pressure wound.[4]

Appellant disclosed two experts: Tisha Barzyk, DNP ("Barzyk") and Robert Villare, M.D. ("Dr. Villare"). Their deposition testimony will be briefly summarized; additional testimony will be discussed as it becomes relevant to the analysis. Nurse Barzyk testified to specific actions by both Appellees that, in her professional opinion, deviated from the applicable standard of care. As to Nurse Roberts, she identified deficiencies in the timeliness of the wound consult order and the failure to notify a physician. Regarding Nurse Robinson, she opined that he fundamentally departed from the standard of care by acting outside the scope of his practice. Dr. Villare was retained to address causation. He opined that multiple systemic failures in care aligned to allow the development and worsening of Mr. Hampton's condition, and that these failures were the proximate cause of the stage-four and unstageable sacral pressure wound. His criticisms of specific conduct largely mirror those identified by Nurse Barzyk.

Appellees argued that Mr. Hampton's expert testimony was insufficient to sustain a medical negligence action against each Appellee. The

---

[4] Stage four, the most serious stage, are deep wounds that expose underlying tissue—including muscle, ligaments, tendon, and even bone—to the open air. These wounds pose a very high risk of infection. A pressure wound may be deemed "unstageable" when the severity of the wound is so extensive that it cannot be accurately assessed due to the presence of dead or necrotic tissue that needs to be surgically debrided before the wound can be staged.

-4-

Circuit Court agreed, and this appeal followed. On appeal, Nurse Roberts primarily challenges the sufficiency of Dr. Villare's causation testimony, but also contends that Nurse Barzyk: (1) relied on unsupported assumptions and (2) failed to identify a breach of duty by Roberts. Nurse Robinson raises similar arguments focused on causation. In essence, Appellees contend that Appellant's expert proof fails because it does not establish causation with "sufficient particularity."

## STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Kentucky Rules of Civil Procedure ("CR") 56.03; *see Steelvest v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 480 (Ky. 1991). In Kentucky, such a judgment is only proper "when it appears impossible[5] for the nonmoving party to produce evidence at trial warranting a judgment in [its] favor[.]" *Id.* at 482; *see also Andrew v. Begley*, 203 S.W.3d 165, 169 (Ky. App. 2006); *Paintsville Hospital Co. v. Rose*, 683 S.W.2d 255 (Ky. 1985); *Pile v. City of Brandenburg*, 215 S.W.3d 36, 39 (Ky. 2006). "[T]he movant should not succeed unless his right to judgment is shown with such clarity that there is no room left for controversy." *Steelvest*, 807 S.W.2d at 482. Even if a trial court believes the party opposing the motion may

---

[5] "While the Court in *Steelvest* used the word 'impossible' in describing the strict standard for summary judgment, the Supreme Court later [states] that word was 'used in a practical sense, not in an absolute sense.'" *Lewis v. B & R Corp.*, 56 S.W.3d 432, 436 (Ky. App. 2001).

not succeed at trial, it should not render a summary judgment if there is any issue of material fact.[6]  *Id.* at 480.

The Kentucky Supreme Court has repeatedly admonished that the rule is to be cautiously applied for it is clearly not the purpose of summary judgment to prematurely cut litigants from their right of trial if they have issues to try.  *Id.* Consequently, the record must be viewed in the light most favorable to the party opposing the motion, and all doubts are to be resolved in their favor.  *Id.*  "Because summary judgment involves only legal questions and the existence of any disputed material issues of fact, an appellate court need not defer to the trial court's decision and will review the issue *de novo*."  *Jenkins v. Best*, 250 S.W.3d 680, 688 (Ky. App. 2007).

## ANALYSIS

A common law negligence case requires proof of: (1) a duty owed by the defendant to the plaintiff, (2) breach of that duty, (3) injury to the plaintiff, and (4) a causal relationship between the breach and the injury.  *Wright v. House of Imports, Inc.*, 381 S.W.3d 209, 213 (Ky. 2012).  In a medical negligence case, proof of these elements almost always requires expert testimony.  *Johnson v. Vaughn*, 370 S.W.2d 591, 596 (Ky. 1963); *Keene v. Commonwealth*, 516 S.W.2d

---

[6] An issue of material fact is one where "the factual dispute actually affects whether the party moving for summary judgment is entitled to judgment in his/her favor."  *Key v. CitiMortgage, Inc.*, 686 S.W.3d 630, 637 (Ky. App. 2023).

-6-

852, 855 (Ky. 1974).  Expert testimony must establish "the applicable . . . standard of care, any breach of that standard, and the resulting injury."  *Blankenship v. Collier*, 302 S.W.3d 665, 675 (Ky. 2010).  "[T]he lack of expert testimony is truly a failure of proof [for which] a summary judgment is appropriate."  *Adams v. Sietsema*, 533 S.W.3d 172, 177 (Ky. 2017).

Pursuant to CR 26.02(4)(a)(i), to survive summary judgment parties must disclose their experts, as well as the basis of their opinions.  An expert must state that each defendant both violated the standard of care, and that violation caused the alleged injury.  *CertainTeed Corp. v. Dexter*, 330 S.W.3d 64, 74 (Ky. 2010); *see Jewish Hospital St. Mary's Healthcare, Inc. v. House*, 563 S.W.3d 626, 631 (Ky. 2018).  Succinctly, to survive summary judgment, a plaintiff must present a genuine issue of material fact for every element.  *Andrew*, 203 S.W.3d at 170.

To support a finding of the element of proximate causation expert testimony must express that "the conduct in question must be a substantial factor in causing the injury."  *Ashland Hosp. Corp. v. Lewis*, 581 S.W.3d 572, 577 (Ky. 2019) (citations omitted).  In other words, the nexus between the alleged act and the injury is more than a speculative possibility.  *Richmond v. Hunt*, 596 S.W.3d 103, 106 (Ky. App. 2019).  However, causation need not be stated in terms of absolute certainty.  The Court has explained that "[w]hile evidence of causation must be in terms of probability rather than mere possibility, we have held that

-7-

substance should prevail over form and that the total meaning, rather than a word-by-word construction, should be the focus of the inquiry." *Quattrocchi v. Nicholls*, 565 S.W.3d 622, 633 (Ky. 2018) (quoting *Baylis v. Lourdes Hospital, Inc.*, 805 S.W.2d 122, 124 (Ky. 1991)).  The standard requires "sufficient proximate cause testimony for a jury to reasonably weigh the evidence on causation, not that the testimony be so definitive that there is no longer a question left to the jury." *Id.* at 633.

Having set forth the governing standard, we next consider whether, after viewing the record in the light most favorable to Mr. Hampton and drawing all reasonable inferences in his favor, a genuine issue of material fact remains. Appellees attack the following elements: standard of care, breach, and causation. "In response to a motion for summary judgment, the respondent must present at least some affirmative evidence showing the existence of a genuine issue of material fact[.]" *Haugh v. City of Louisville*, 242 S.W.3d 683, 686 (Ky. App. 2007) (internal quotation marks and citations omitted).  We shall address each element in turn.

## A. Standard of Care & Breach

In a medical negligence action, a plaintiff must establish the applicable standard of care[7] and demonstrate that the defendant's conduct deviated from that standard. *Blankenship*, 302 S.W.3d at 670. Here, both elements are satisfied.[8] The record contains detailed expert testimony identifying the professional obligations of each nurse and describing specific departures from those obligations. Barzyk's testimony, in particular, outlines the standard practices expected of nursing staff and explains how both Appellees failed to meet those expectations.

Nurse Roberts contends that Mr. Hampton fails to establish a breach in the standard of care, but Barzyk is exacting in her testimony. Though she does acknowledge the broad systemic issues at UK, she identifies specific acts and omissions by Nurse Roberts that, in her professional opinion, deviate from the standard of care:

> Q: Fair enough. Any other standard of care criticisms you have of Ms. Roberts?
>
> A: I think that in the realm of identifying the wound she should have notified a physician, her practice was to also do a consult, but there's no evidence in the record that she

---

[7] In medical negligence cases the element of duty is expressed through the applicable standard of care.

[8] Nurse Robinson concedes as much in his own argument. Appellee Robinson's Brief, p. 11; 13.

documents that she does anything, so she doesn't say that she notified the nurse, she doesn't say she notified the physician, she doesn't say she put a wound consult in, so either she knew or should have known that there was a new finding and that she needed to do something about it, and with 18 years of experience I would have expected her to do more than she did.

. . .

Q: Any other opinions of Ms. Roberts?

A: Not in particular, no.

Q: So in essence she should have written the wound care consult?

A: I mean I think there's other things she should have done, but she said that's what she would have done, is that she would have notified a physician and done a wound consult, but I did look at her turning, she didn't put him on his back, which was the appropriate thing to do.

TR 518-19. Throughout her deposition, Barzyk repeatedly points to Nurse Roberts' lack of action as a deviation from the standard of care. TR 664.

Nurse Roberts further alleges that Barzyk bases her testimony on assumptions. Rather, we find that she identified gaps in the record—specifically, the lack of documentation and failure to notify a physician or follow-up with Mr. Hampton—as deviations from the standard of care. When Barzyk stated that she "assumed" Roberts did not notify anyone, she was highlighting the absence of evidence in the record, which is itself a proper basis for her opinion. In other words, Barzyk's conclusions stem directly from the record and the recognized

standards of nursing practice, not from speculation regarding what may or may not have occurred.  She says as much in her testimony.

> Q:  And if she talked to Ms. Foster and said we need to put a wound consult in—
>
> A:  But that's passing the buck, that's not her doing her duty to take care of the patient because there's no way that she can prove that she didn't tell Joni, but what if Joni doesn't do it? I mean there's no follow-up again, it's people just saying things to other people and never gets documented in the record. I mean if Joni had never put the order in it just never would have happened.
>
> Q:  It did happen, though, didn't it?
>
> A:  But that's not the point. You're saying that if she had – you're assuming she told her, I'm assuming she didn't.
>
> . . .
>
> A:  . . . you can't tell because of the way these flow sheets come out.
>
> . . .
>
> A:  . . . I don't think you can say one way or the other because of the way that the records show, there's no metadata on the record to show that this was entered by this nurse at this time.
>
> Q:  Are you just taking sides in this case, ma'am?
>
> A:  I'm not taking sides, I'm telling you what the records say. That's the great part about being an expert, I'm just saying this is what the records say, and then having worked in a nursing unit I can tell you that's how these things happen, things get dropped all the time, which is

why you're supposed to be responsible for doing it yourself.

TR. 518-19.

Despite Nurse Robinson's concession that Barzyk sufficiently testifies to create a genuine issue of material fact, we briefly address the matter.[9] Barzyk again identifies specific conduct by Nurse Robinson that she believes deviates from the standard of care.

> Q: . . . what is it specifically do you believe Jason Robinson did that constitutes a breach of the standard of care?
>
> A: I believe he performed outside of his scope of practice.
>
> Q: What did he do specifically outside his practice?
>
> A: He went in, he diagnosed, he developed a treatment plan, he instituted that treatment plan and then never followed up on it.
>
> Q: So if we narrow down the criticism of Jason Robinson is it not what he did on May 4, 2020, but he did not have a follow-up care plan?
>
> A: A little of both, I mean I think he missed what was actually happening with the patient . . .
>
> . . .

---

[9] Nurse Robinson's primary contention appears to be that the expert testimony is insufficient on both breach of the standard of care and causation because Barzyk addresses the former while Dr. Villare addresses the latter. That the expert testimony piecemeals the elements is immaterial to our analysis. The governing standard views the entire record; thus, one single expert need not cover every element to survive summary judgment.

Q: What did he miss, in your opinion?

A: . . . you can tell he doesn't understand pressure injuries . . .

Q: So the way he described his assessment of Mr. Hampton did he breach the standard of care?

A: Yes, because he didn't identify what was actually happening, he incompletely assessed him.

TR 578-79; 780; 784. Further, Barzyk discusses what she views as Nurse Robinson's critical lack of understanding regarding pressure wounds, going as far as to opine that he was not qualified to give this kind of care to begin with. Her testimony plainly identifies deviations from the standard of care as to both Appellees, more than sufficient to preclude summary judgment.

**B. Causation & *Mullins* "Sufficient Particularity"**

Although expert testimony must establish a causal connection in terms of probability rather than mere possibility, causation need not be expressed with absolute certainty or in talismanic language. *Quattrocchi*, 565 S.W.3d at 633. The dispositive question is whether the testimony provides sufficient evidence for a jury to reasonably weigh and determine whether the defendant's conduct was a substantial factor in causing the injury. *Id.* Furthermore, courts must evaluate the record in its entirety and discern its overall meaning, rather than focus narrowly on

isolated or equivocal statements in the expert testimony. *Steelvest*, 807 S.W.2d at 480.

Appellees argue that under a recent opinion from our Court, *Mullins v. Appalachian Regional Healthcare, Inc.*, the expert testimony here is not "sufficiently particular" enough to create a genuine issue of material fact. 707 S.W.3d 1, 8 (Ky. App. 2025). For the sake of properly addressing this argument, we will briefly relay the facts of *Mullins*. Mr. Mullins was an older man suffering from a variety of ailments leading to extended hospitalization. *Id.* at 4. During the approximately two weeks he was on a ventilator, he developed stage three pressure wounds and later passed away from complications related to his care. *Id.* The ensuing medical malpractice suit named forty-two defendants, including "unknown defendants." *Id.* at 4-5. Each count in the complaint repeated identical, boilerplate allegations with the defendants' names substituted in and contained no case-specific facts or details. *Id.* Over the next year, discovery was largely unproductive. Motions to compel yielded little, and the plaintiff repeatedly sought, and missed, deadlines for expert disclosures. *Id.* at 6. When experts were finally identified, none attributed specific conduct to any individual defendant or connected their opinions to a particular timeframe or act of negligence.[10] *Id.* at 8.

---

[10] Rather, one of the provided expert reports provided only a broad statement: "[I]t is my preliminary opinion that [Hazard ARH], its staff, including nursing staff, and all other defendants

-14-

Our Court held that this showing was not sufficiently particular to survive summary judgment, emphasizing the notice requirement baked into CR 26.02 expert disclosures. "A generalized statement outlining a broad subject matter about which an expert may testify does not *sufficiently apprise* the other party of the information needed to prepare for trial as contemplated and mandated by the notice requirements of CR 26.02(4)(a)." *Id.* at 7 (quoting *Clephas v. Garlock, Inc.*, 168 S.W.3d 389, 393-94 (Ky. App. 2004)) (original emphasis omitted) (emphasis added). The thrust of *Mullins* requires that each opposing party receives fair notice of the specific allegations against them based on his or her particular conduct. Viewed alongside Kentucky's high standard for granting summary judgment, *Mullins* functions as a safeguard—ensuring that each defendant understands precisely what alleged act or omission he or she must be prepared to defend at trial.

In fact, *Mullins* itself illustrates the distinction with the underlying facts here. The only class of defendants who survived summary judgment did so because one of the plaintiff's experts identified specific actions and omissions that, in the expert's opinion, violated the applicable standard of care, particularly regarding the prevention and treatment of pressure wounds. Causation was

---

failed to comply with the applicable standards of care in the treatment of Mr. Mullins, contributing to his poor recovery from his illness." *Mullins*, 707 S.W.3d at 8.

likewise established. The expert opined that Mr. Mullins died from sepsis, that the infection originated at his dialysis port, and that the port was compromised by an advanced bedsore. *Id.* at 9. From this testimony, the Court concluded that a reasonable jury could infer that the wound care failures contributed to the infection and resulting sepsis that caused Mr. Mullins' death.

Thus, Appellees' reliance on *Mullins* is unavailing. Indeed, the expert testimony here more closely resembles that against the defendants in *Mullins* who were not granted summary judgment. While Mr. Hampton's experts did make some generalized observations about UK and its nursing staff, they also identified particular acts and omissions by Appellees that deviated from the standard of care and arguably caused or contributed to Mr. Hampton's injuries. This distinguishes the record here from the testimony in *Mullins* deemed insufficient, where the expert frequently relied on broad statements without connecting alleged wrongdoing to specific defendants.

Even if Dr. Villare at times spoke generally, he consistently opined that Appellees combined neglect was the proximate cause of Mr. Hampton's injuries as they were the parties primarily responsible for his care. And neither is such a conclusion altogether unreasonable considering Mr. Hampton, then paralyzed and whom by all accounts was to be repositioned frequently, somehow developed a pressure wound on his backside. Dr. Villare opines that failing to

implement preventative measures creates the risk of wound progression. He also

identifies specific lapses in care attributable to each Appellee, and states that when

nurses fail to perform their duties, these lapses in care contribute to the progression

and worsening of pressure wounds.

> Q: All right. So can you give me just a thumbnail sketch of what your opinions are in this case.
>
> . . .
>
> A: So basically if the UK – I'm referring to University of Kentucky hospital – nurses had implemented aggressive measures, careful attention to details, then Mr. Everett's wounds likely would not have progressed after discharge. . . .
>
> . . .
>
> Q: Why are you singling out Nurse Roberts and Nurse Robinson versus any other nurses in this case?
>
> A: They were the two nurses who had the opportunity to see this patient, be sure that he was followed up on by a higher level skilled practitioner . . .
>
> . . .
>
> A: That's their – their focus is to assess, do a nursing assessment . . . It's assess and report.

TR 596; 517. When asked about Nurse Roberts, he reiterates that she failed her

primary role as a nurse.

> Q: . . . And I guess the first question I'm going to ask you is: Do you intend to come to Kentucky or tell a jury by

remote means that anything that Sharon Roberts did or did not do resulted in physical harm and physical pain to Everett Hampton, including the development and progression of pressure wounds in Everett Hampton, that the pressure wounds were a proximate cause in the development of the stage four and unstageable sacral pressure wound and that such negligence was a substantial contributing factor in the pain and suffering Everett Hampton experienced?

A: Yes.

. . .

Q: Well, let's be frank, Doctor, you don't have any idea what Sharon Roberts' involvement is in this case, do you, as we sit here today?

A: I only know that she didn't – the nurse's function is to assess and report. I'll repeat that, assess and report. And if she assessed it, saw that wound, she should have reported it to either a wound care nurse or a physician and had someone address that. That's my – that's my main focus and criticism.

TR 674-75. As noted here, Nurse Roberts' alleged lapse in care is clearly identified: failure to assess and report.[11] When Dr. Villare is asked about Nurse Robinson, he again points to specific lapses in care. He reiterates that the specific omissions of Robinson and Roberts, together with systemic failures, were proximate causes of the worsening of Mr. Hampton's injuries.

---

[11] These alleged failures arguably contributed to the fragmentary medical record subsequently relied on by Dr. Villare. Furthermore, an expert's need to explain and opine about gaps in a medical record supports, rather than contradicts, the contention that a genuine issue of material fact exists in this case.

Q: What injury do you think or do you believe that Jason Robinson caused Mr. Hampton?

A: That way you phrased that, I don't believe that Jason Robinson injured Everett Hampton, but the neglect, what he didn't assure was done for Mr. Everett Hampton, is what caused and lead to a proximate cause of his further injury . . .

. . .

A: [Nurse Robinson] should have consulted a general surgeon or wound care physician. To this day I can't understand why he just left that go and wanted to handle all that responsibility himself? I can tell you that my nurses would never do that.

. . .

Q: Let me ask it in a different way. What do you believe that Mr. Robinson failed to do that caused an injury to Mr. Hampton?

A: . . . and I think it's clear to me he should have seen that patient every day.

. . .

A: I'm not blaming everything on Jason Robinson or a particular nurse. There are several defects in care, it can all line up like slices of Swiss cheese, and when they happen, they together are proximate cause of the injury or adverse event of a patient.

TR 517; 606; 611; 613.

According to the expert testimony, Mr. Hampton had several risk factors for developing pressure wounds. Under the proper standard of care, he

-19-

would have been monitored, repositioned regularly, and any consults would have been timely. Dr. Villare opines that a lack of care can lead to the development and worsening of bedsores and then identifies specific lapses in each Appellees' care. Reasonable minds can differ as to whether Appellees' actions, or rather lack thereof, substantially contributed to the exacerbation and delayed healing of Mr. Hampton's injuries. *See Shelton v. Kentucky Easter Seals Soc., Inc.*, 413 S.W.3d 901, 916 (Ky. 2013) (summary judgment is available if "reasonable minds cannot differ or it would be unreasonable for a jury to find breach or causation"). But that makes causation a jury question. For the purposes of surviving summary judgment Appellant has sufficiently apprised Appellees of their alleged blameworthy conduct and connected the "dots" in the causal chain. *See Brown v. Griffin*, 505 S.W.3d 777, 783 (Ky. App. 2016).

Whether the expert testimony ultimately proves persuasive is not the inquiry before this Court. Under Kentucky's demanding summary judgment standard and viewing the record in a light most favorable to the nonmovant, we disagree with the Circuit Court's conclusion that causation was inadequately supported. While the experts may have expressed some uncertainty in phrasing, their testimony, taken as a whole, consistently attributed a likely causal role to each Appellee in the worsening of Mr. Hampton's injuries. *See Richmond*, 596 S.W.3d at 109 (equivocality in expert testimony is tolerated).

## CONCLUSION

For the foregoing reasons, we REVERSE the Circuit Court's summary judgment order and REMAND for further proceedings consistent with this Opinion.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Masten Childers, III
Adam Havens
Justin S. Peterson
Kellie M. Collins
Eric P. Von Wiegen
Sarah E. Cooley
Lexington, Kentucky

BRIEF FOR APPELLEES SHARON
ROBERTS, R.N. AND TRUSTAFF
TRAVEL NURSES, LLC:

Shelby G. Sanford
Louisville, Kentucky

BRIEF FOR APPELLEE JASON
ARIC ROBINSON, R.N.:

Donald P. Moloney, II
Madeleine B. Loeffler
Lexington, Kentucky